DIXON, *Appellant*, v. THE CHICAGO & ALTON RAILROAD COMPANY.

IN BANC.

1. **Railroad:** MASTER AND SERVANT: NEGLIGENCE. A laborer, working in defendant's quarry, under direction of a foreman having no connection with the train service, is not a fellow-servant of employes operating a passenger train on defendant's line.

2. **Negligence:** FELLOW-SERVANTS. The rule of exemption on account of fellow-service discussed.

3. **———:** INDEPENDENT CONTRACTORS: FELLOW-SERVANTS. Employes of independent contractors, engaged in separate branches of labor upon a common enterprise, are not fellow-servants.

4. **Contributory Negligence:** QUESTION FOR JURY. A quarry hand was working about a railroad track, near a curve at which locomotives were required, by defendant's rules, to whistle. His duties compelled him to frequently stand on the track with his back towards the curve, and to attend to the movement of small cars carrying rock across the main track to an inclined plane leading to a rock crusher. He was hit and killed by an engine coming rapidly around the curve without the required signal; *held*, in the circumstances stated in the opinion, that the question whether he used ordinary care to avoid danger was one of fact for the jury.

5. **Railroad:** NEGLIGENCE: BELL AND WHISTLE. The omission of the warning signal was evidence of negligence in running the train.

6. **Practice:** NONSUIT: QUESTION FOR JURY. The court is authorized to pronounce certain conduct negligent, only when no other construction may reasonably be placed upon it in the circumstances.

*Appeal from LaFayette Circuit Court.*—HON. RICHARD FIELD, Judge.

REVERSED AND REMANDED.

ACTION by Katie Dixon, widow, for damages for the death of Charles Dixon. Defendant had judgment under an instruction of the court. Plaintiff appeals.

The following statement was made by BARCLAY, J.:

Plaintiff has appealed from a judgment for defendant in an action for the negligent killing of her husband. No point arises on the pleadings.

These are the main facts:

Defendant operated a quarry and a rock crusher in Jackson county, Missouri, for preparing rock to ballast its road. The quarry lay a short distance south, and extended two or three hundred feet alongside of defendant's line. From different parts of the quarry narrow tracks ran, converging at a turntable, seven or eight feet in diameter, the north edge of which was nine feet south of defendant's main track. The rock crusher stood forty or fifty feet north of the track. From the turntable, a small track, called by witnesses a "strap track," crossed the main line at a right angle, and ran up an inclined plane to the crushing machine, thirty or forty feet from the ground. Small cars carried the rock to the crusher. They were first drawn along the quarry tracks by a mule to the turntable, and shifted by it into position to strike the strap track. Then a wire cable (fastened at one end to a drum in the crushing machinery) was made fast to one car at a time, which was pulled across the railroad track, up the inclined plane, to the crusher, by means of the steam power used to operate that machine. The rock was unloaded, and the empty car let down to the turntable again by the same wire cable. The latter had a ring or clevis at the end, by which it was attached (as occasion required) to a large iron hook on each car.

A number of hands were engaged in operating this quarry under the superintendence of a foreman who had power to employ and discharge subordinates with-

out consulting anyone, but had no control whatever over trains or the trainmen.

Plaintiff's husband had been at work at the quarry a long time. About a month before his death he had been assigned the duty of attaching the cable to the little cars between the turntable and the crusher, and detaching it again when the cars returned, as has been described. He was also required to assist in turning the table to get the cars in proper position.

Defendant's line approaches the crusher from the east, for some two thousand feet, on an ascending grade of about forty-eight feet to the mile. A short distance (variously stated at from one hundred to four hundred feet) east of the crusher a "forty-minute" curve begins, and extends thence eastward about nineteen hundred feet, bearing towards the south.

While plaintiff's husband had been there at work, about a dozen trains passed daily, including two regular passenger trains each morning, one about eight o'clock and the other about thirty minutes later.

A rule of the company required a signal by sounding the whistle to be given at all obscure curves. An obscure curve is one in which a train at one end cannot be seen from the other end of the curve. It is conceded that the curve in question was an obscure one, and that it was usual for locomotive engines to whistle before reaching the quarry.

On the morning of December 20, 1886, about eight o'clock, one of defendant's passenger trains from the east, within two or three minutes of its regular time, running at the rate of twenty-five or twenty-eight miles an hour, approached the crusher. Plaintiff's evidence strongly tends to prove that no whistle was sounded from it. When the train reached the "strap track" crossing, it struck and killed Dixon, who was working

there.    Both wheels of the engine passed over the cable at that place.

There was proof of plaintiff's relationship to the deceased, and of all other formal matters, but the trial court declared the law to be that, on the facts above outlined, plaintiff could not recover, "because the said engineer and Dixon were fellow-servants."

Accordingly, the jury returned a verdict for defendant. After saving exceptions, and taking the usual steps for a review, plaintiff appealed.

All other necessary facts are stated in the opinion of the court.

*Graves & Aull* for appellant.

(1)    The court after all the evidence gave a peremptory instruction to the jury to render a verdict for the defendant.    *First.*  This instruction was granted by the court on the ground that said Dixon was a fellow-servant of the trainmen, and, therefore, the company could not be held liable.    The same point will, without doubt, be urged in this court.    For the complete refutation of such an argument, the appellant cites the following authorities, to-wit:    *Sobieski v. Railroad*, 42 N. W. Rep. 863; *Hough v. Railroad*, 10 Otto (100 U. S.) 222; *Marshall v. Schricker*, 63 Mo. 312; *Hall v. Railroad*, 74 Mo. 298; *Proctor v. Railroad*, 64 Mo. 112; *Railroad v. Ross*, 112 U. S. 377.    *Second.*  The following authorities show who are fellow-servants, to-wit: *Railroad v. Ford*, 17 Wall. 553; 1 Q. B. 149; 62 Me. 463; 31 Ind. 174; 23 Cent. Law Jour. 316, and cases cited; *Railroad v. Hoyt*, 12 N. E. Rep. 225; *Mill Co. v. Johnson*, 114 Ill. 57; *Railroad v. Hawk*, 12 N. E. Rep. 255; *Waldhier v. Railroad*, 32 Fed. Rep. 278, and note; *Slater v. Chapman*, 35 N. W. Rep. 160, and note; *Railroad v. Herbert*, 116 U. S. 648; *O'Hare v. Railroad*, 9

S. W. Rep. 23; *Murray v. Railroad*, 12 S. W. Rep. 253; *Sullivan v. Railroad*, 97 Mo. 113; *Ridings v. Railroad*, 33 Mo. 527; *Railroad v. Sullivan*, 43 N. W. Rep. 416, and cases cited. (2) As to the responsibility of the defendant for the failure of Hill to discharge his duty in sounding the whistle whereby Dixon came to his death, are the following cases: *Gormley v. Iron Works*, 61 Mo. 492; *Whalen v. Church*, 62 Mo. 326; *Cook v. Railroad*, 63 Mo. 397; *Stephens v. Railroad*, 86 Mo. 221; *Crane v. Railroad*, 87 Mo. 588; *Stoddard v. Railroad*, 65 Mo. 514; *Bromley v. Railroad*, 12 Mo. App. 594; *Railroad v. O'Brien*, 21 Pac. Rep. 32. (3) The evidence showed that the defendant had established a whistling post for the purpose of warning the men engaged at the quarry that trains were approaching, and that the engineers in charge had always sounded the whistle in approaching this point, excepting on this occasion. The evidence shows that Dixon must have relied upon the sounding of the whistle to notify him of the approach of the train. The railroad company, therefore, owed this duty to Dixon, and no negligence of a fellow-servant would exempt the defendant from liability. *Hulchon v. Railroad*, 58 Wis. 319, and cases cited.

*James G. Trimble* and *George Robertson* for respondent.

(1) The fact that the deceased was consociated with those in charge of the train brings this case within the rule announced by this court in *Murray v. Railroad*, 98 Mo. 573. (2) The deceased was a fellow-servant with the engineer and the defendant is not liable. "All who are directly engaged in accomplishing the ultimate purpose in view, that is, the running

of the road, must be regarded as engaged in the same general business within the meaning of the rule." *Hard v. Railroad*, 32 Vt. 473; *Wright v. Railroad*, 25 N. Y. 562; 7 American & English Encyclopedia of Law, p. 384; *Lanning v. Railroad*, 49 N. Y. 521. The defendant having a competent engineer in charge of the train that killed plaintiff's husband, its duty was fulfilled. The following have been held fellow-servants: Engineer and shoveler on gravel train, *Railroad v. Tindall*, 13 Ind. 366; engineer and section hand, *Railroad v. Riddle*, 62 Tex. 267; engineer and roadmaster, *Walker v. Railroad*, 128 Mass. 8; engineer and laborers on gravel train, *Ryan v. Railroad*, 23 Pa. St. 384; engineer and telegraph operator, *Slater v. Jewett*, 85 N. Y. 61; engineer and switch-tender, *Farwell v. Railroad*, 4 Metc. 49; *Slatterly v. Morgan*, 35 La. Ann. 1166; engineer and track repairer, *Railroad v. Colhorn*, 73 Ind. 261; engineer and station agent, *Brown v. Railroad*, 31 Minn. 553; engineer and brakeman working ground switch, *Randall v. Railroad*, 15 Am. & Eng. R. R. Cases, 243; engineer and employe in tunnel, *Capper v. Railroad*, 21 Am. & Eng. R. R. Cases, 525. The following cases of this state are in harmony with the foregoing citations and cases: *McDermott v. Railroad*, 30 Mo. 115; *Rohback v. Railroad*, 43 Mo. 192; *Harper v. Railroad*, 47 Mo. 576; *McGowan v. Railroad*, 61 Mo. 532; *Brothers v. Cartter*, 52 Mo. 375; *Evans v. Railroad*, 62 Mo. 52; *Conner v. Railroad*, 59 Mo. 299; *Blessing v. Railroad*, 77 Mo. 410; *Moon v. Railroad*, 85 Mo. 588; *Murray v. Railroad*, 98 Mo. 573; *Higgins v. Railroad*, 104 Mo. 413. (3) It was the duty of the deceased to keep the cable off the track. He was negligent in leaving the cable on the track, and in running before a rapidly moving train to remove it. This being disclosed by the plaintiff's own evidence, it was the duty of the court to

direct a verdict for the defendant. *Yancey v. Railroad*, 93 Mo. 433; *Fletcher v. Railroad*, 64 Mo. 484; *Powell v. Railroad*, 76 Mo. 80; *Lenix v. Railroad*, 76 Mo. 86; *Taylor v. Railroad*, 86 Mo. 457; *Cagney v. Railroad*, 68 Mo. 416. When the evidence fails to connect the negligence with the accident, the court should direct a verdict for the defendant. *Holman v. Railroad*, 62 Mo. 562; Thompson on Trials, sec. 1678. When it appears from the plaintiff's case alone that he is guilty of contributory negligence, the court should direct a nonsuit. *Prideaux v. Mineral Point*, 43 Wis. 513. "If it appears without any conflict of evidence from the plaintiff's own case, or from the cross-examination of his witnesses, that he is guilty of negligence proximately contributing to produce the injury, it is the duty of the court to declare as a matter of law that the plaintiff cannot recover. *Buesching v. Gaslight Co.*, 73 Mo. 219; *Stephens v. Macon*, 83 Mo. 355. By such evidence plaintiff disproves his case. *Milburn v. Railroad*, 85 Mo. 109; Thompson on Trials, sec. 1680. (4) The deceased assumed the risk of being injured by a train while keeping the cable out of the way of passing trains. No rule is better settled than that the servant assumes all risks incident to his employment. Whitaker's Smith on Negligence, p. 127, note m, also p. 133; Wood's Master & Servant, 678; *Price v. Railroad*, 77 Mo. 508; 78 Mo. 559; *Keegan v. Kavanaugh*, 62 Mo. 232. When the servant is injured as the result of his failure to obey the orders of the master he cannot recover. Whittaker's Smith on Negligence, 129; Wood's Master & Servant, 778.

BARCLAY, J. — Plaintiff, as the widow of the deceased, Mr. Dixon, sues under the damage act (R. S. 1889, ch. 49), claiming the statutory recovery

for his death, caused, as is charged, by negligence in the operation of one of defendant's passenger trains.

The deceased was a quarry laborer, under orders of a foreman who had entire control of the quarry, represented the defendant there, hired, discharged and directed the men, and had no connection with the train service, so far as appears, in any way.

The first decisive question is, whether deceased and the passenger trainmen are to be regarded as fellow-servants, within the meaning of the rule exempting the master from liability for injuries negligently inflicted upon one employe by another in a common employment. This rule has long been acknowledged as part of the general common law, but efforts to apply it in particular cases have lead to expressions of wholly irreconcilable views among eminent jurists. These differences seem to spring from the difficulty experienced in assigning the reasons for the rule itself to serve as solid premises in applying it. "Public policy" (*McDermott v. Railroad* (1860), 30 Mo. 116), "implied contract" (*Hutchinson v. Railroad* (1850), 5 Exch. 343; *Lovell v. Howell* (1876), 1 C. P. Div. 161), "general convenience" and "expediency" (*Farwell v. Railroad* (1842), 4 Metc. (Mass.) 49) have been severally mentioned and enlarged upon by learned judges as grounds on which it should stand; but, whatever strength those grounds may have, a stronger reason for its existence to-day is *stare decisis*, itself, however, a maxim of cogent force in determining judicial action in countries tracing their systems of law to the English source.

The doctrine of exemption is of comparatively recent origin. Its history has been frequently written, and is too familiar to the legal profession to justify repetition here. It sprang into life suddenly, with remarkable vitality and power, and, as originally form-

ulated, was supposed to control many states of facts to which it would not now be applied anywhere.

It was at first thought to exempt the master from liability for injury to one servant by reason of the neglect of another to furnish or maintain a reasonably safe plant and machinery for the master's work, of whose defects the injured servant was ignorant *(Waller v. Railroad* (1863), 2 Hurl. & C. 102; *McDermott v. Railroad* (1860), 30 Mo. 115); but such an application of it is now universally discarded, either because of statutory declarations on the subject (for example, the "Gladstone Bill," in England, 43 & 44 Vict. (1880), ch. 42, sec. 1; Mass. Act (1887), ch. 270, etc.), or of decisions by the courts without the aid of legislation. *Lewis v. Railroad* (1875), 59 Mo. 495; *King v. Railroad* (1882), 14 Fed. Rep. 277; *Railroad v. Herbert* (1886), 116 U. S. 642; 6 Sup. Ct. Rep. 590.

Again, the scope of the rule was long supposed to relieve the master of responsibility for negligence of a servant under whose direction another was working, and by whose neglect the latter was injured, though the negligence of the former may have involved the exercise of the supervising control delegated to the superior servant. *Albro v. Canal Co.* (1850), 6 Cush. 75, and *Howells v. Steel Co.* (1874), 32 L. T. (N. S.) 19, will illustrate that line of decisions sufficiently. And, although that view is still approved in some quarters, the weight of authority at this time in this country is to the contrary. *Pantzar v. Mining Co.* (1885), 99 N. Y. 368; *Railroad v. Bowler* (1872), 9 Heisk. 866; *Darrigan v. Railroad* (1884), 52 Conn. 285; *Railroad v. Ross* (1884), 112 U. S. 377; 5 Sup. Ct. Rep. 184; *Moore v. Railroad* (1885), 85 Mo. 588.

But the demands of the case at bar do not make it necessary to enter upon any general discussion of the changes that have taken place in the law on this topic

since it began to engage the attention of the courts. Suffice it, for the present, to say that maturer consideration by the judiciary, and the emphatic commands of legislation in some localities, have greatly modified the rigor and narrowed the rule of exemption as originally put forth.

[Besides the statutes already mentioned, note Alabama Acts, 1885, p. 115, also Code, 1886, sec. 2590; Florida Laws, 1887, ch. 3741; Georgia Acts, 1885, p. 115, also Code, 1873, sec. 3036; Iowa Laws, 1862, ch. 169, also Code, 1880, sec. 1307; Kansas Laws, 1874, ch. 93; Minnesota Laws, 1887, ch. 13; Mississippi Code, 1880, sec. 1054, p. 309, and Constitution, 1890, sec. 193; Montana R. S. 1879, sec. 318, p. 471; Texas Laws, 1891, ch. 24; Wisconsin Acts, 1889, ch. 438; Wyoming Laws, 1876, sec. 1, ch. 97.]

These modifications no doubt conform to more humane conceptions, now prevailing, of the demands of justice with regard to the existing relations of master and servant.

To-day some enterprises reach across a continent. Often they extend beyond the limits of a single state. Many contemplate the performance of several kinds of business, requiring the employment of thousands, and the organization of several departments of service, separate in their operations, but tending to the general advantage of the common employer.

To what extent employes in different lines or departments of business followed or established by such a master are co-servants is a question constantly recurring, and one of its phases is presented by this case.

The circuit court held that the deceased and the trainmen were fellow-servants. In reviewing that ruling we will not essay to establish any definition of fellow-service to enlighten (or increase) the difficulties

of this branch of the law, but shall merely deal with the facts before us as shortly as possible.

We think it clear that where a common employer carries on two enterprises, as variant in character as those here considered, each under separate superintendence, the employes at work in each cannot justly be regarded as fellow-servants of the employes in the other, within the meaning of the rule of exemption.

In the case in hand the master had seen fit to place the deceased quarryman and the trainmen under supervision and management totally apart from each other. They were not "acting under the same immediate direction." *Railroad v. Mackey* (1887), 127 U. S. 208; 8 Sup. Ct. Rep. 1161. Each looked to a different individual as the master's representative for directions in his work, and had no practical connection with the superior who guided and supervised the acts and conduct of the other.

If Dixon, instead of being killed, had merely noticed repeated acts of negligence by the trainmen in omitting to signal its approach, what could he have done to correct such course of conduct, and insure his own safety? Complain to his foreman? The foreman directing his work had no power to discharge or to control the trainmen referred to. The theory that a servant entering employment may fairly be considered to assume the risks (among others) of possible injury from the negligence of his fellow-workmen (now most frequently mentioned as the groundwork of the exemption) can have no just or logical application where the supposed fellow-servants are so widely severed by the division of the employer's business that neither can have a ready appeal to any common superior, having power to require (and, if need be, to enforce) correct and careful conduct on the part of the other. Such an appeal furnishes to the servant the means to avert,

or at least to diminish, the dangers arising from incompetency or carelessness on the part of his fellows. But when that appeal is impossible, by reason of the total severance of their fields of labor and of the control to which they severally are subject, we apprehend there is little left of recognizable principle upon which servants so situated can be supposed to have mutually assumed the risks of each other's negligence.

Workmen so distantly related to each other in the master's service as the quarrymen and the train operatives here are scarcely more nearly allied, for all practical purposes of mutual observation, vigilance and protection, than are the servants of different independent contractors, engaged in separate branches of labor upon a common enterprise (though we do not mean to imply that the legal relations between them are identical). Employes of the latter class are universally held not fellow-servants within the rule under discussion. *Abraham v. Reynolds* (1860), 5 Hurl. & N. 142; *Turner v. Railroad* (1875), 33 L. T. (N. S.) 431; *Johnson v. Lindsay* (1891), 16 App. Cas. 371; *Svenson v. Steamship Co.* (1874), 57 N. Y. 108; *Railroad v. Conroy* (1886), 63 Miss. 562.

Quarrying and operating passenger trains upon a railway are essentially different sorts of work. The risks incident to each are unlike those encountered in the other. Nor were the operatives in these departments thrown into any sort of habitual business association under a common superior. Each line of service appears to have been conducted as independently, in every respect, as though controlled by a stranger to the other, with this exception: The servants in each employment drew compensation from the same source. But we do not regard that fact (standing alone) as furnishing the touchstone of fellow-service.

Without going further, however, into the general subject, or attempting to express an opinion on any other facts than those here in judgment, we believe the considerations above suggested (in the light of recent decisions in this state and elsewhere) lead directly to the conclusion that the trial court was in error in ruling, as a matter of law, that deceased was a fellow-servant with the engineer of the train that struck him.

In the following cases, the rule of exemption from liability, because of the relation of fellow-service, was held inapplicable.

*Sullivan v. Railroad* (1889), 97 Mo. 113; 10 S. W. Rep. 852, where a track-walker was killed by the negligence of train operatives.

In *Connolly v. Davidson* (1870), 15 Minn. 519 (Gil. 428), a deckhand on a steamboat was hurt by an explosion, caused by the negligent management of the boiler of another boat; the boat-owners being partners.

*Railroad v. Carroll* (1871), 6 Heisk. 347, presents the case of an injury to a trackman by the negligence of trainmen.

In *Baird v. Pettit* (1872), 70 Pa. St. 477, a draughtsman in an establishment for the manufacture of locomotives sustained injuries by falling into an unguarded excavation, made on the premises by carpenters in defendant's employ.

In *Pool v. Railroad* (1881), 53 Wis. 657; 11 N. W. Rep. 15, a detective, while riding on a handcar, was injured by negligence of the servants operating the car.

*Garrahy v. Railroad* (1885), 25 Fed. Rep. 258, arose in Kansas City, Missouri, as the record therein shows (though the printed report does not), and was decided by the late Mr. Justice MILLER. The plaintiff, a common laborer, one of a gang distributing rails along the track, was hurt by the negligence of the

operatives of a switch-engine, used in the railway yard where plaintiff was working, and a recovery by plaintiff was sustained.

*Hobson v. Railroad* (1886), 11 Pac. Rep. (Ariz.) 545, was the case of a teamster, hired to haul ties, who was injured by the negligence of an engine-driver of a train.

In *Railroad v. O'Brien* (1889), 1 Wash. St. 599; 21 Pac. Rep. 32, a track laborer, while being carried on a gravel train to his place for work, was injured by a collision with another train, resulting from the neglect of the operatives of the latter to "flag" the former, as ordered.

In *Railroad v. Kelly* (1889), 127 Ill. 637; 21 N. E. Rep. 203, a section hand had sustained damages from the negligent action of employes upon a construction train.

In *Howard v. Canal Co.* (1889), 40 Fed. Rep. 195, which arose in Vermont, a trackman on a handcar was killed by the carelessness of train hands.

*Pike v. Railroad* (1890), 41 Fed. Rep. 95, is a Missouri case, decided by Judge THAYER, whose learning and long experience in the administration of law in this state entitle his opinions to great weight.   In it he held that a watchman of a railroad bridge, who was hurt by negligence of the driver of a locomotive of a passing train, was not a fellow-servant of the latter.

In *Evans v. Coal Co.* (1891), 47 Fed. Rep. 437, in Washington, a laborer employed by defendant in the work of constructing a railway to haul coal from a mine received an injury by reason of the negligence of one of defendant's miners, engaged in the same locality, in handling lumber.

II.    Whether the quarryman (Dixon) was properly chargeable with contributory negligence in the premises, is the next question raised on this appeal.

The court is authorized to pronounce certain con-
duct negligent only when no other construction may
fairly and reasonably be placed upon it in the circum-
stances; but where the facts are such as would warrant
a reasonable inference that ordinary care has been taken
by the person in question, the issue, whether or not
such care was really exercised by him, is for triers of
the fact to decide. The rule on this point has been so
often stated that it is not necessary to dwell upon it.

Dixon's general duties have been already indicated.

The following further facts, bearing on the partic-
ular issue now under consideration, should be noted:

Defendant's foreman testified that Dixon, in the
performance of his work, "would stand about the
center of the main track on the east side of the strap-
track, with his back to the east, facing the west;"
that, as he "was right-handed, it came handier to him
to stand in the center of the main track, on the east
side of the strap track, in detaching the cable;" that
he had had but one other man besides Dixon at that
post, and they both handled the cable in the same way;
that it was the duty of Dixon to keep the cable off the
main track when it was not attached to a car; and
that, when running regularly, "those cars go up and
down between the quarry and crusher about every
three minutes."

He also said that the steam crusher, while at work,
made considerable noise as the rock passed through
it. It was running that morning. He was on top of
the quarry when the accident happened, one hundred
and fifty feet from the turntable. He did not hear the
train that hit Dixon.

Another employe, standing within thirteen or
fourteen feet of the track, and forty or fifty feet from
Dixon, did not hear the train till it was passing him.
Dixon was last seen by this witness, about the center

of the main track, at the junction with the strap track, facing toward the northwest, looking down. When struck, he was in the act of stooping, and seemed to be reaching for the cable.

From the point where Dixon then was, an engine could ordinarily be seen, by one looking eastward, for a distance of one thousand and thirty-five feet; but, from the crossing track, near the turntable, the range of view in that direction was reduced by intervening objects to two hundred and fifty or three hundred feet.

It also appeared in evidence that the atmosphere was "right smart" foggy that morning.

Can it be justly said, in view of these facts, that the deceased was negligent as a matter of law?

The noise of the steam rock crusher, not fifty feet distant, obscured, if it did not obliterate, that of the coming train, as is shown by the fact that even the foremen and the workman nearest Dixon did not hear its approach. The work at which Dixon was engaged demanded close attention, and necessitated his frequently taking a position in which his back was towards the engine that hit him. From the main track at the strap-track crossing, the locomotive (at the rate of speed it had) could not have been seen thirty seconds before it passed there; and, from points nearer the turntable, where Dixon's duties required him frequently to go, it could not have been discovered within seven seconds of its arrival, because of obstacles reducing the range of view eastward.

He was bound to use common prudence to avoid danger; but that prudence should be measured after giving due weight to all his surroundings. His immediate work involved some risks of its own, and called for constant vigilance; and, without further comment, we hold that the question whether or not he came up

to the standard of ordinary care in the circumstances of his situation is very clearly one for the jury.

This branch of the case, moreover, seems to have given no difficulty in the trial court. The learned circuit judge evidently coincided with the views we have taken of it. The result there was definitely placed by him on the single ground that the deceased was a fellow-servant of the train employes.

III. There was abundant direct evidence of the omission of the engine men to sound the whistle signal as the train came around this obscure curve. Defendant's rule and custom required such a signal, and the failure to give it was evidence of negligence on defendant's part in managing the locomotive. If that omission should be found, as a fact, to have caused the death of Dixon, we cannot properly say that such finding would be an unreasonable inference from the evidence.

We consider the showing by the plaintiff sufficient to justify the submission of the cause to the jury for findings upon the disputed issues of fact raised by the pleadings, and that the trial court was in error in directing a verdict for the defendant.

The judgment will be reversed, and the cause remanded. BLACK and BRACE, JJ., concur. SHERWOOD, C. J., dissents.

---

ON REHEARING IN BANC.

---

PER CURIAM (BLACK, BRACE, BARCLAY and THOMAS, JJ.).—The foregoing statement and opinion of the majority of division number 1 are adopted and approved by the court *in banc* after a full reargument.

MACFARLANE, J., did not participate, having been of counsel in the cause. SHERWOOD, C. J., and GANTT, J., dissent.